JOHNSON, Judge.
Mr. and Mrs. Etienne J. Desroche filed this suit for damages against Mr. and Mrs. R. C. Seybold and their liability insurer. Mrs. Desroche suffered personal injuries. Mr. Desroche sued for property damages, expenses and for the injuries sustained by their minor son as the result of an accident on April 7, 1965, in the City of New Orleans, when their automobile was struck in the rear by an automobile driven by Mrs. Seybold, as Mrs. Desroche’s vehicle was about to enter St. Charles Ave *289 nue from the down ramp of the Mississippi River Bridge Expressway.
After a trial by jury, Mrs. Desroche recovered judgment for $17,500.00 against defendants in solido. The jury also returned verdicts in favor of Mr. Desroche for $1,-058.99 for property damage and other expenses, and also for $250.00 for damages suffered by their minor son.
Defendants have appealed only from the judgment in favor of Mrs. Desroche, conceding their liability, and limiting this appeal to the question of whether the amount of damages allowed Mrs. Desroche by the jury is excessive.
As to quantum, the record contains the testimony of the plaintiff; Dr. Haik, an eye specialist; Dr. Llewellyn, a neurologist, and Dr. Nix, plaintiff’s family physician, who is a general surgeon. Defendants produced no countervailing medical evidence.
Deposition of Dr. George M. Haik, whose specialty was ophthalmology.
Dr. Haik examined Mrs. Desroche in his office on April 19, 1965. He had seen her about ten years before that when she was complaining of headaches and eye itching. He gave her glasses at that time. (Mrs. Desroche testified that she got the glasses but never wore them). Ten years ago he thought she had an allergy which affected her eyes and she then did have an astigmatism for which the glasses were prescribed.
He next saw her on May 11, 1965. She was wearing a collar. Her chief complaint on this and on the first visit on April 19th was that she had some difficulty in reading. He thought this was the result of presbyopia, which is normal in persons 40 years old or over. He did not think this condition was connected with the accident of April 7, 1965. Astigmatism was still present. He prescribed glasses on May 11, 1965, for reading only. Dr. Haik did not see her after May 17, 1965, when she brought her glasses in to be checked. The doctor said it is possible that presbyopia may have been brought on a little earlier by the accident. He did not find any sign of trauma. He did not think the accident, the' trauma to the neck or cervical spine, affected the eyes but said “ * * * I guess it is possible * * * ”
Dr. Raeburn C. Llewellyn, whose specialty is neurosurgery.
Dr. Llewellyn saw Mrs. Desroche May 6, 1965, at the request of Dr. Nix, who, she said, had prescribed treatment of bed rest, muscle relaxant medicines, restriction of activities, traction to the neck area three times a week, and a cervical collar. She told Dr. Llewellyn that she was improving from the treatment. Dr. Llewellyn examined her .from a neurological standpoint limited to the neck area. Examination of the neck revealed restriction of the cervical spine movements to two-thirds normal range of motion. His diagnosis was cervical spine sprain. He found marked soreness to palpation over the lateral cervical muscles. These muscles were in mild to moderate degree of spasm. Also he found soreness to palpation of the posterior cervical muscles and interspinous ligament in the mid-cervical area. The muscles at the base of the skull were tender. The cervical nerves, the spinal cord and brain were all normal. Examination did not reveal any neurological deficit or loss of function. It was his opinion that she did not have any neurological disorder as the result of her injury. In other words, his examination was negative from a neurological standpoint. H'e thought she would make an uneventful recovery in three to six months with an occasional return of muscle soreness or aching which could be treated with aspirin or hot baths. He did not find any coldness of the upper extremities. It was his opinion that she had a moderate to moderately severe cervical sprain. He also said that a good recovery is 90 to 95% active as the person would desire to be, with occasional return of muscle soreness. The nerves about the neck and the peripheral nerves of the upper extremities were all normal in their entirety.
*290 Dr. James T. Nix, whose specialty is surgery.
Dr. Nix first saw the plaintiff on April 7, 1965, very shortly after the accident on that same day. She complained of pain in the back of the neck. She looked like she was in pain and “shook up a bit.” There was muscle spasm in that area.
On April 9, there was some spasm in the muscles of the neck and back and strap muscles on both sides.
On April 15, she complained of some eye signs, her eyes felt funny, and pain in the right arm. (He referred her to Dr. Llewellyn and that doctor’s report was that the neurological examination was negative).
As to her eyes she was referred to Dr. Haik. (Dr. Haik found age creeping up and prescribed glasses for reading only). Dr. Nix saw the plaintiff on April 17, 21 May 10, 17, June 28, 30, September 28 and December 14, 1965, September 17, 1966 and the last time on January 6, 1967. In the meantime she came to the office several times for traction treatment but did not see the doctor. He had prescribed a plastic collar which she wore.
Dr. Nix diagnosed her trouble as cervical sprain, whiplash with traumatic onset and i sprain affecting the sternocleiodal mastoid muscle. He said she had exhibited scalenus syndrome before the accident which he said recurred to a greater extent after the accident. Dr. Nix thought she had a duodenal ulcer but said this was not borne out by X-ray. He thought an ulcer was brought on by stress which aggravated her stomach complaints and complaints of extreme nervousness. Dr. Nix said he based this opinion on his clinical findings and later in his testimony he said that clinical proof is a “doctor’s sixth sense.” The doctor said this is just a speculative opinion, which he said he could not prove. He said the scalenus muscle is back of the rib muscle and that the word syndrome means a collection of symptoms. He treated her for scalenus syndrome three years before the accident and she showed signs of it after the accident. He said he felt muscle spasm in some of the muscles and also thought that underlying muscles would be affected though he could not feel them. Dr. Nix felt coolness in the right arm and thought she had a more severe whiplash than the average one and he also thought she had some scar tissue resulting from possible hemmorhage of the muscles. He was asked if she had a 10% permanent disability and he said: “This is an estimate * * * I cannot predict an anatomical rate of disability.”
On cross-examination at the trial he said the plaintiff told him that in addition to the treatments administered in the doctor’s office she used head traction at home. His discovery deposition was read to him and his statement in the deposition was: “ * * * she did not tell me that but I always encourage my patients to use it.” When he examined her on June 30, 1965, he made no record of there being any complaint of pain at that time. He said that she was largely free of symptoms on September 28, 1965, though subsequently her symptoms returned. She did not return to his office for three months when she came in on December 14, 1965. She had not taken any treatment in his office for that three-month period. On the December 14th visit she complained of pain in the right back radiating over the lower abdomen which he attributed probably to a lumbar strain. Whether the back pain was due to a previous history of pyelitis during pregnancy or to a back strain, he could not be sure one way or the other.
Dr. Nix said that he had treated her before this accident when she had muscle spasm in the side of her neck and she had right scalenus syndrome and probable muscle spasm in a couple of parts of her back because her posture was bad. He thinks, however, that the spasm was worse after the accident than it was before the accident.
Testimony of Mrs. Desroche.
The plaintiff was 42 years old. She testified that at the sceije of the accident the po *291 lice asked her if she wanted to go to a hospital and she said she wanted to go to Dr. Nix’s office on Carrollton Ave. Her son drove her to Dr. Nix’s office. When Dr. Nix examined her he told her to go to bed and return on April 9. He gave her some sleeping pills and pills for pain. On the 9th when she returned the doctor did not give her any more medicine but ordered a collar for her to wear and told her to do what she felt like doing. She said she wore the collar two or three months after the accident. She was administered traction and heat treatment at the doctor’s office and still uses a heat lamp sometimes at home.
She said she started having stomach spasm a few weeks after the accident and it got so bad that she went to see Dr. Nix about it. He gave her some medicine which is the same kind of medicine that her husband takes for stomach ulcers. Her pains first started in the neck and she had severe pain in the right arm with stomach spasm. She could not read everything, it was sort of blurred. (Dr. Haik gave her glasses for reading purposes, and testified that the glasses must have corrected her eye troubles because after she got the glasses he heard no more complaints about the eyes).
The plaintiff said she had pain in the neck and back on occasions and then the pain would leave and she would feel like she was well, but then it would return worse than ever. Some days everything hurt. She just didn’t know what didn’t hurt. She said sudden changes in the weather or maybe a sick child or something happened to someone close to her might upset her to the extent that she would be nervous and have a bad day. She was asked if she had any bad days before the accident and she said: “Well, we all have bad days. I am talking about the days I hurt. I was healthy before this, I never went to the doctor.” (Dr. Haik and Dr. Nix both testified that she had been to them before the accident and Dr. Nix said she was of a nervous personality, which was one reason he thought she might have an ulcer). Before the accident she liked bowling but tried it once since' then but it pulled so much on her neck that she gave it up. She cannot sit long periods of time with her neck in one position without trouble. Sometimes she says she cannot even pull up the zipper of her dress that opens in the back and she has to go to her neighbor’s house to get zippered up. She said further: “If I force myself I have spasms. Sometimes I have forced myself and it didn’t pay.”
We have considered seriously that rule established by our Appellate Courts that an award for damages for personal injuries in cases of this type should not be disturbed unless there is a clear abuse of the discretion vested in the trial court or jury. This case was tried by a jury. A close study of the testimony leaves us convinced that the jury as laymen must have been overly impressed and influenced by the technical and medical terms found throughout this record to describe plaintiff’s mild and moderately severe injuries and further to suggest and describe only possible disorders and malfunctions which actually were not found to result from this accident. We are also fully cognizant of that established rule that the amount of the award for damages for personal injuries must be fixed on the facts and circumstances of the particular injury under study and that comparison of similar cases is made solely for the exclusive purpose of determining whether or not the amount being reviewed is so excessive or inadequate as to constitute an abuse of that discretion vested in the trial court or jury. We have studied this case and made the comparison in observance of both rules. The clear result is that we conclude and hol’d that this award is greatly excessive and that $7,500 will be a liberal amount to be awarded to Mrs. Desroche in this case.
For these reasons, the decretal portion of the judgment of the Civil District Court for the Parish of Orleans rendered and signed February 6, 1967, in favor of'Mrs. Etienne" J. Desroche and against the defendants must be amended by decreasing the amount awarded to Mrs. Desroche frotn $1/',‘500.00 *292 to $7,500.00 and as amended that part of the judgment shall be as follows:
It is further ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Mrs. Etienne J. Des-roche, and against the defendants, Mr. and Mrs. R. C. Seybold and Liberty Mutual Insurance Company, jointly and in solido,* in the full sum of $7,500.00, and for all costs.
The costs of this appeal shall be paid by the plaintiff, Mrs. Etienne J. Desroche.
Amended and affirmed.